```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                              Plaintiff(s),
                                                              REPORT AND
             -against-                                        RECOMMENDATION
                                                              CV05-494  (JS) (WDW)
CHARLES DOHERTY,
                              Defendant(s).
----------------------------------------------------------X
```

**WILLIAM D. WALL, United States Magistrate Judge:**

Before the court, on referral from District Judge Seybert, is an application for restitution pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA") by Local 46 Metallic Lathers Union and Reinforcing Iron Workers ("Local 46" or "the Union"), joined in by the Building, Concrete, Excavating & Common Laborers Union Local 731 and its associated benefits funds ("Local 731") and the Cement & Concrete Workers and its associated benefits funds ("CCW")(collectively, "the Funds").

For the reasons set forth in this Report, the undersigned recommends that no restitution be awarded, because the arguments set forth by the defendant in the supplemental briefs establish that the Funds did not suffer direct harm from the crime to which Charles Doherty pled guilty, and thus were not victims pursuant to the MVRA. In the event that this recommendation is not adopted by Judge Seybert, I recommend that restitution be awarded on the base figure of $1,988,981.170, with prejudgment interest but not double interest pursuant to ERISA.

Because of the time constraints regarding the restitution award, the time to raise objections to this Report and Recommendation is shortened from 10 days to 4 days, with any objections due on **May 1, 2009.** Any response to the objections must be filed by **May 4, 2009.**

**BACKGROUND**

The Information against defendant Charles Doherty stated, *inter alia,* that:

On or about and between January 1, 1998 and July 31, 2002 . . . Charles Doherty conspired to conduct financial transactions affecting interstate commerce, which in fact involved the proceeds of specified unlawful activity, to wit: uttering forged checks, in violation of Title 18, United States Code, Section 513, theft concerning programs receiving federal funds, in violation of title 18, United States Code, Section 666, mail fraud, in violation of Title 18, United States Code, Section 1341 . . .

DE[18], Ex. C.

Doherty entered into a Cooperation Agreement and a plea of guilty before Judge Seybert on September 12, 2005. *See* DE[47], Exs. A & B. He was sentenced on February 13, 2009 for a single count of violating 18 U.S.C. §1956(h), a conspiracy to launder money in violation of 18 U.S.C. §1956. *See id.*, Ex. C. Prior to the sentencing, in December 2007, Local 46 applied for a restitution award DE[18], and the defendant opposed the application by letter dated December 21, 2007 DE[19]. At the sentencing, Judge Seybert referred the matter to me to determine the amount of restitution due, if any. DE[32]. At a conference before me on March 6, 2009, counsel for the movant union, the defendant, and the government appeared, and, after it was determined that the matter could not be settled, a supplemental briefing schedule was set. *See* Transcript of Hearing, attached as Ex. C to DE[42]. The Union's supplemental brief ( DE[42]), the defendant's opposition (DE[47]), the Union's reply (DE[42]), and the defendant's sur-reply DE[52] are now before the court. The government takes no position on the restitution issue and has submitted no papers.

Doherty's company, United States Rebar, was in the business of bending, placing and installing rebar, that is, reinforcing steel rods, on union job-sites at heavy construction and

building projects. The Union reports that most of US Rebar's workforce was made up of two union trades: (1) metal lathers or ironworkers who bent and installed the rebar and (2) laborers who carried the steel. According to the Funds, the majority of US Rebar's union workforce during the time relevant to Doherty's criminal activity was metal lathers from Local 46. The remainder of the union workforce - the laborers- were, according to the Union, almost exclusively members of Local 731 and CCW. The Union states that US Rebar was a party to collective bargaining agreements (CBAs) that required payments to the union funds for every hour worked by union employees, and that Doherty engaged in a scheme to "pay certain weekly wages and benefits of U.S. Rebar employees directly in cash, off the books, in order to evade the required benefit contributions." DE[18] at 5-6. Doherty wrote US Rebar checks to fictitious vendors and presented them to his co-conspirator, check casher Joseph Castello, for conversion to cash, some of which Doherty then distributed to US Rebar's union employees. *Id.* at 6. This scheme, the Union argues, "had the effect of avoiding significant benefit contributions mandated by the applicable CBAs and defrauding union benefit funds of vast sums due and owing," thus making the Funds victims of Doherty's crime and entitling them to restitution. *Id.* at 7.

**DISCUSSION**

Based on Doherty's underlying crime and failure to pay benefit contributions, the Union argues that the Funds should receive restitution pursuant to the MVRA. Doherty argues that the Funds cannot receive restitution because they are not victims under the terms of that statute, which defines a victim as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any

person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C.§3663A(a)(2).  The Funds argue that Doherty waived this argument and conceded that they are victims.

As noted *supra*, the Union originally filed its restitution request in December 2007. Doherty responded with a short letter dated December 21, 2007 that asked Judge Seybert to set a schedule for a reply and briefing.  DE[19]   Doherty also argued that no restitution should be awarded because of civil suits that had been filed by the movants against him.  He did not argue that the Union was not a victim under the MVRA.  The Funds now construe the December 21 letter as having conceded that the Funds are victims and argue that Doherty's repeated failures to raise this issue amount to a waiver.  DE[49] at 1-2.  The court does not agree.  It is true that the first time that Doherty appears to have raised the argument that the Funds are not victims under the MVRA is in the supplemental papers allowed by the undersigned at the March 6 conference. Nonetheless, Doherty is correct in arguing that the court cannot find a waiver of this issue.  The court has no inherent power to award restitution but may do so only on the terms set forth by statute. *See United States v. Donaghy,* 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008).  The court cannot ignore the requirements of the statute just because a party has not raised them.  Further, the defendant raised the arguments in a supplemental brief allowed by court.  No waiver took place.

Nor does law of the case establish that the Funds are MVRA victims.  The Funds note that, at Doherty's sentencing hearing, Judge Seybert stated that Mr. Doherty "shall pay restitution," and that she referred the matter to me for a determination of the "amount" of restitution due.  I do not interpret those statements to indicate a formal finding by Judge Seybert

4

that the Funds were victims. Implicit in Judge Seybert's comments is the concept that Doherty shall pay restitution if the Funds qualify under the statute, and that I shall recommend an amount if the statutory standards are met. Thus, I turn to the argument raised by Doherty that the Funds are not MVRA victims because they were not directly and proximately harmed as a result of the commission of the offense to which Doherty pled guilty and for which he was convicted.

      A defendant sentenced under the MVRA, Doherty argues, "is only responsible to pay restitution for the conduct underlying the offense for which he has been convicted," here, the money laundering conspiracy with Castello. *Id.* at 2 (quoting *U.S. v. Adams,* 363 F.3d 363, 366 (5th Cir. 2004)). Thus, he continues, the Funds can be victims under the MVRA only if they were directly harmed by the specific money laundering conspiracy for which Doherty was convicted. This argument somewhat conflates the issues of whether the Funds are victims and to what extent a victim is entitled to restitution. Those issues overlap, however, under the circumstances before the court, as the discussion will reflect. Doherty was convicted of conspiracy to launder money, with Joseph Castello as his co-conspirator,[1] and the existence of the conspiracy is significant to the determination of whether the Funds are victims. As noted earlier, the MVRA defines a victim as someone who, in the case of an offense that involves a conspiracy as an element, is directly and proximately harmed by that conspiracy. The court must thus determine precisely what the crime that Doherty was convicted of entailed. Relevant to that determination, Doherty urges that when, as here, a defendant is convicted pursuant to a plea agreement, the Court defines the underlying crime by looking beyond the charging instrument to the "mutual

---

[1]Castello was prosecuted in a separate proceeding. The court is aware of no effort by the funds to seek restitution from Castello, although co-conspirators can, under some circumstances, be jointly and severally liable for restitution. *See Donaghy,* 570 F. Supp. 2d at 423-24.

understanding of the parties," including a consideration of the plea agreement and statements made by the parties during the plea and sentencing hearings. DE[47] at 2 (citing *United States v. Adams,* 363 F.3d 363, 366-67 (5th Cir. 2004)). The court will examine those sources.

Doherty notes that his Cooperation Agreement with the government states that "no criminal charges will be brought against the defendant for his heretofore disclosed participation in criminal activity involving his . . . defrauding union benefit funds, and all related money laundering." *Id.* at 2-3. He also looks to the transcript of the plea hearing to support his contention that his guilty plea did not encompass defrauding union benefit funds such as the Funds. *Id.* at 3 & Ex. A. Although he used some of the illegally gotten cash to pay union employees, he explains, "depriving union benefit funds of contributions was not part of the money laundering conspiracy to which he pleaded guilty . . . [and] the money laundering conspiracy involved only the forging of checks and other conduct . . ." irrelevant to the Funds' claim. *Id.* Relying on colloquy at the Sentencing Hearing, he urges that he was convicted "only for a money laundering conspiracy that was completed once he received the cash from the check casher, and . . . potentially defrauding the union funds was a *separate, secondary* scheme for which Mr. Doherty has not been charged or convicted. *Id.* at 5. While it is true, he continues, that he "used the proceeds of the forged checks to engage in other activity, including paying workers in cash, that particular use of the proceeds was not part of the conspiracy to launder money, nor did it violate any of the elements of the money laundering conspiracy." *Id.* at 5-6. The elements of that crime included uttering false checks and a minority business enterprise fraud unrelated to the Funds. *Id.* at 6. Therefore, he concludes, the Funds are not 'victims' (within the meaning of the MVRA) of Mr. Doherty's money laundering crime." *Id.* at 5 & Ex. C

6

at 17-22.

The Funds do not agree, calling Doherty's interpretation of his money laundering conspiracy conviction "tortured." DE[49] at 3. The money laundering statute, 18 U.S.C. §1956, provides in pertinent part that:

> (a)(1)Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity —
>     (A)(i) with the intent to promote the carrying on of specified unlawful activity; . . .
>     (B) knowing that the transaction is designed in whole or in part —
>         (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. . .

The conspiracy provision, 18 U.S.C. 1956(h), provides that "Any person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." The crime of conspiracy to launder money is proven when the government shows that "the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy, and that an overt act in furtherance of the conspiracy was committed." *United States v. Huezo,* 546 F.3d 174, 181 (2d Cir. 2008) (citation omitted).

In order to understand Doherty's argument and the Funds' objection to it, we must look to each parties' definition of the "unlawful activity" and the "financial transaction" elements of the crime to which Doherty pled guilty. The Information defines the "specified unlawful activity" as uttering false checks, theft from programs receiving federal funds, and mail fraud. DE[18], Ex.

C. The parties seem to agree that those acts constitute the "specified unlawful activity." They differ, however, on what constituted the "financial transaction" element of the crime. Doherty asserts that the passing of the cash by Castello to Doherty was the financial transaction. DE[52] at 4. The Funds argue that Castello's giving of cash to Doherty was part of the underlying specified unlawful activity, and that subsequent acts, including paying the workers with the ill-gotten cash, constitute the financial transactions at issue. DE[49] at 7. Under that construction of the crime, they argue, they were directly harmed by Doherty's completion of an element of the crime he pled guilty to and are victims under the MVRA,

The court agrees with Doherty that the crime of which he was convicted - conspiracy to launder money- was "completed" when he received the cash from Castello. In some money laundering cases, a defendant already has cash that needs to be laundered through some financial transaction. Here, however, it was the receipt of the cash from the fraudulent checks that completed the crime. Doherty might have done anything or nothing with the cash after he received it, but the crime of conspiracy to launder money, which here included the crime of laundering money, had already been committed by the time the cash was given to the union workers. It was the common goal of the co-conspirators to turn false checks into cash and there is no basis for finding that the use of that cash to pay union workers was part of the conspiracy. Instead, that use was, as Doherty urges, a separate scheme. As the *Donaghy* court explained in its analysis of the extent to which the victim NBA was entitled to restitution, although the definition of victim in the MVRA is broad, that statute "only permits recovery for conduct that was part of the applicable scheme, conspiracy, or pattern of conduct that is the offense of conviction." 570 F. Supp. 2d at 426 (citations omitted).

I reach the conclusion that the Funds are not MVRA victims without reference to the government's agreement not to prosecute Doherty for his failure to report and pay benefit contributions to the Funds. That agreement alone would not necessarily bar the Funds from qualifying as victims. As Doherty himself has recognized, the MVRA "does allow for recovery for uncharged or acquitted conduct that is part of the scheme, conspiracy or pattern of criminal conduct that was an element of the offense of conviction," but "it does not allow for recovery for acts committed in furtherance of a broader uncharged scheme being carried on by one of the co-conspirators." *See* DE[47] at 6-7 (citing *Donaghy,* 570 F. Supp. 2d at 427). The payment in cash to union workers and the concomitant failure to pay benefit contributions is just such a "broader uncharged scheme carried on by one of the co-conspirators" - Doherty. Although the Funds were directly harmed by that broader scheme, they were not harmed by the conspiracy of which Doherty was convicted and are not victims of the offense of conviction.

In reaching this conclusion, the court is not blind to the harm suffered by the Funds as a result of Doherty's criminal activities, but is constrained by the requirements of the MVRA to find that the Funds did not suffer the <u>direct</u> and proximate harm from the convicted crime that the statute requires. Presumably, the Funds will pursue the civil remedies that are available to them.

**Amount of Restitution:**

Although I have recommended that the Funds are not victims under the MVRA, I will include recommendations on the amount of restitution sought, so that it will be before Judge Seybert in the event that she does not adopt the above recommendation. The presentation of the amount of alleged loss here is somewhat unusual. The MVRA requires, and the Second Circuit has held, the the government bears the burden of proving the amount of loss sustained by the

9

victim by a preponderance of the evidence. 18 U.S.C. §3664(e); *United States v. Reifler,* 446 F.3d 65, 122 (2d Cir. 2006); *Donaghy,* 570 F. Supp. 2d at 423. Here, the government has taken no position on the restitution and provided no proof of loss whatsoever. I note this anomaly for the record, but note further that the government has not argued that the Funds are entitled to no restitution, and I will consider the Funds' proof of loss.

Despite Doherty's arguments to the contrary, it is clear that a restitution award "need only to be a reasonable estimate of the victim's actual losses." *See Donaghy*, 570 F. Supp. 2d at 423 and cases cited therein. "Although estimates are appropriate, a court must base its restitution award on more than mere speculation about a victim's actual losses." *Id.* (citing *United States v. Catoggio,* 326 F.3d 323, 329 (2d. Cir. 2003)). Uncertainties with respect to the amount should be resolved in favor of the victim. *Id.* ( citations omitted). The appropriate measure of loss is the "value of the property wrongfully taken by the defendant." *Id.* at 424 (citing 18 U.S.C. §§3663(b)(1)(B), 3663A(b)(1)(B), & *United States v. Sapoznik,* 161 F.3d 1117, 1121 (7th Cir. 1998)). Here, no money was literally "taken" from the Funds, but they were deprived of the benefits contributions that Doherty should have made on behalf of his union workers and the court will consider that as the Funds' measure of loss.

In its original filing, the Union sought $2,045,419.20 in restitution. DE[18] at 10. In their supplemental papers, the Funds seek $3,838,358.22 as of the date of filing, including awards of interest and liquidated damages. DE[42]. The Funds state that the base restitution figure should be $2,209,979.68. *Id.* at 7. They explain that their reasonable estimate started with the amount of $11,168,000, the amount Doherty pled guilty to laundering between 1/1/98 and 7/31/02. They then reduced that amount by 5% to reflect the fees charged to Doherty by

10

Castello, bringing the base figure to $10,609,600, all of which, they claim, was used to pay US Rebar's union workers. Next, they applied a "fraud multiple," which they define as the percentage of the total hourly package, that is, wages, dues, and benefits, for Doherty's union workers for which they are seeking reimbursement. *Id.* Excluded from the calculation of the fraud multiple are benefit contributions for the Vacation and Annuity Funds, because such payments are required to be held in subaccounts for individual workers and not for the Unions at large. DE[18] at 15, n.7; DE[42] at 7-8, n.5. Other deductions were made for Local 731 and CCW. *See* DE[42] at 7-8, n.5. The Funds have provided tables setting forth the fraud multiple calculations on a year to year basis, along with tables of the hourly rates required under the relevant CBAs, rates on which the fraud multiples are based. *See* DE[18], Exs. E & F; DE[42], Exs D, E, F, G, H, I & J. Application of a fraud multiple of 20.83% results in a base restitution figure of $2,209,979.68.

In their reply brief, the Funds reduce the base restitution figure somewhat, based on arguments raised by Doherty in his opposition. They accept Doherty's claim that not all of the laundered money was used for cash payments to union workers but instead was diverted to Doherty and his now deceased partner, and/or was paid to Dick Carpinello. Based on those claims, the Funds state that the base figure should be reduced by $300,000 to reflect cash kept by Doherty and by some further amount to reflect payments to Carpinello, but no hard figure is set forth. The court will rely on Doherty's own acknowledgment that "over 90%" of the $11,168,000 which he admitted laundering was used to pay workers, and will use $10,051,200, that is, 90% of $11,168,000, as the starting point. Reduced by Castello's 5% fee, that amount becomes $9,548,640. Multiplying that amount by the fraud multiple of 20.83% results in a base

11

restitution figure of $1,988,981.170 and the court recommends that figure be used.

The Funds set forth several reasons why the base restitution figure is "extremely conservative," despite the fact that uncertainties about restitution amounts are to be resolved in favor of the victim." DE[42] at 8 (citing *Donaghy,* 570 F. Supp.2d at 423). Those reasons are (1) the exclusion of cash payments made by Doherty from 1996 through 12/31/97; (2) use of the lowest fraud multiple that could be determined; (3) acceptance at face value of Doherty's claim that he paid his union workers their full hourly package, that is, both wages and benefits; and (4) treatment of all cash payments as having been made to Journeyman members and not Apprentices, an approach that resulted in a significantly lower fraud multiple. *Id.* at 8-9. Add to that the reductions for cash that went to Doherty and Carpinello.

Doherty argues that no reasonable estimate of the Funds' actual losses is possible and that an amount that is conservative in favor of the defendant is just as unreasonable as one that favors the victim unreasonably. I find that although the evidence that the Funds use to calculate their base restitution amount might well "push the envelope" of acceptability under the MVRA, that it does provide a basis for arriving at a *reasonable* estimate and is far from mere speculation. To conclude otherwise would reward Doherty for committing a crime that is not susceptible to more precise calculation, and would subvert the underlying goal of the MVRA, that is, to make the victim whole. *See Donaghy,* 570 F. Supp.2d at 423. While it is true, as Doherty argues, that a much more precise calculation could be arrived at using "actual evidence showing who received case, how much they received, when they received it, and the purpose of the payments," that evidence is not available as a result of Doherty's criminal activity, and he should not be rewarded for its absence.

Doherty raises numerous other arguments against the amounts sought, all of which are adequately defeated by the Funds in their Reply memorandum. *See* DE[49] at 11 - 17. The court will comment on one of the arguments, that is, that a restitution award would result in a windfall to the Funds. *See* DE[47] at 18-19. Doherty argues, in essence, that any recovery by the Funds for pension contributions would be a "pure windfall" because there is no dispute that they have already received those monies and the benefits will not go to the individuals who "earned" them. DE[47] at 16-19. The Funds argue that there will be no windfall resulting from the fact that pension credits will not be awarded to specific workers because contributions to the pension funds are not directed to sub-accounts for individuals. Instead, "employer contributions to the Pension Fund are used to both fund previously vested pensions of retirees and to make it more likely that the Pension Fund (which is currently underfunded) will be able to meet its future obligations to past, current, and future members." DE[49] at 13. Given that it is the Funds that are victims, and not the individual workers, there would be no windfall. The court agrees and finds no evidence in the record to support a finding that those benefits were already paid to the Funds. Nor does the court find merit in Doherty's numerous other objections. The base restitution amount of $1,988,981.170 is a reasonable estimate of the Funds' actual loss and, should Judge Seybert determine that the Funds are victims pursuant to the MVRA, it should be the figure used to calculate the restitution amount.

The Funds also seek prejudgment interest and statutory "double interest," or liquidated damages, pursuant to ERISA. The court agrees that the Funds are entitled to pre-judgment interest, but the ERISA double interest request raises questions. There is no doubt that unions receive double interest awards, also called liquidated damages, based on delinquent contributions

in ERISA cases. *See* 29 U.S.C. §1132(g)(2)(C). Here, however, the Funds are not proceeding in an ERISA action and the court agrees with Doherty that there is no basis for awarding double interest.

The court turns next to the problem of the prior civil lawsuits by the Funds against Doherty, one of which ended in a settlement and one of which was discontinued by the plaintiffs. In his opposition, Doherty recognizes that this court is not bound by the civil settlement. Rather, he argues, that settlement was entered into with the Funds' full knowledge of the criminal prosecution, and that the amount voluntarily arrived at in the settlement should be the amount used by this court. I do not agree. The amount arrived at in a settlement in a civil action, which may or may not have been based on fraudulent representations by Doherty, should not control the amount of restitution.

Finally, I find that the court cannot specify the allocation of restitution among the three unions based on the chart provided by Local 46. *See* DE[49], Ex. J. If a restitution award is made, the unions will have to work out among themselves how those monies are to be divided.

## OBJECTIONS

A copy of this Report and Recommendation is being sent to counsel for the parties and the movant by electronic filing on the date below. Because of the time constraints, an expedited objection schedule must be set. *See United States v. Barney,* 568 F.2d 134, 136 (9th Cir. 1978) (ten day period in which to object is a maximum, not a minimum, and court may require a response within a shorter period if "exigencies of the calendar" require); *Hispanic Counseling Center v. Inc. Village of Hempstead,* 237 F. Supp. 2d 284, 289-90 (E.D.N.Y. 2002). As noted

earlier, any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 4 days, that is, no later than **May 1, 2009**, with any response to be filed by **May 4, 2009.** Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. §636 (b) (1); Fed. R. Civ. P. 72; *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
April 27, 2009

                                                  s/ William D. Wall
                                                 WILLIAM D. WALL
                                                 United States Magistrate Judge